Case number 21-3012, Kevin Thornton versus Jay Forshey. Oral argument, 15 minutes per side. Mr. Castor for the appellant. Good afternoon. Good afternoon, your honors, and may it please the court. I'm Donald Castor of the Ohio Innocence Project on behalf of Mr. Thornton. In this case, Mr. Thornton was convicted of a crime that he didn't commit because his trial counsel failed to consult with appropriate expert witnesses. The court below erred in failing to grant Mr. Thornton habeas relief and I requested that this court reverse that decision and remand the case with instructions to issue a writ of habeas corpus. Your honors, there are two issues before the court today. The first is whether Mr. Thornton has established his actual innocence sufficient to overcome procedural obstacles to a merits hearing of his habeas claim. And the second is whether he received ineffective assistance of counsel. Your honors, with respect to the first issue and the actual innocence claim, the the schloop claim that Mr. Thornton raises in order to get past procedural obstacles in this case, the evidence is clear here that Mr. Thornton could not have been the person who robbed the cash express in Milford, Ohio. And it's clear because the science tells us in this case and specifically both in the state courts and in this court, Mr. Thornton presented the analysis of an expert in photogrammetry. As the court knows from the papers in this case, that's a discipline that allows videos to be analyzed for the for the heights of objects in those videos. Mr. Thornton simply put wasn't the right height to be the robber that was depicted in the surveillance video. This court has previously opined favorably, albeit a different panel of this court, but this court has previously opined favorably on Mr. Thornton's showing of innocence. As the court is aware, this case was a second or successive habeas petition and Mr. Thornton had to come to this court to seek leave to file the second or successive habeas petition in the first place. And a panel of this court agreed that Mr. Thornton had made a sufficient prima facie showing of innocence to merit permitting his claim to be filed in the district court. A more thorough review of the record indicates that that showing goes beyond just a prima facie case. The state, the respondent rather, said something interesting in its brief to this court. Respondent said, well, Mr. Thornton's claim is merely consistent with innocence, not demonstrative of it. But indeed, the record before this court is inconsistent with Mr. Thornton not being innocent. This isn't a case where Mr. Thornton is relying on recantations or relying on people who may have incentives to lie. This is a case in which Mr. Thornton is relying on scientific analysis, on analysis that's never been rebutted or refuted by either the state in the proceedings of the state court or by the respondent in the proceedings before the habeas court, your honors. And when we wonder, is the photogrammetry a big deal? Should it have mattered? We should look, your honors, to what the trial court said about it. The trial court in denying a petition for post-conviction relief and determining that under state procedural rules, it couldn't look at the photogrammetric analysis that had been presented to it, said it would have gone a long way with the jury. Those were the trial court's words. Those were the words of the trial judge who presided over both trials of Mr. Thornton. Those words should carry weight. Under AEDMA, they always carry weight when they go against Mr. Thornton. Our position is they carry weight when they're in Mr. Thornton's favor. This court should pay attention to what the trial court said about the factual record in this case. The trial court, or I'm sorry, the district court in this case, seemed to get hung up in relying on the photogrammetric analysis on whether or not it had been subject to cross-examination. Well, the response to that is of course it had been not subject to cross-examination because Mr. Thornton has never been given the opportunity to have it submitted to cross-examination. Mr. Thornton requested an evidentiary hearing at every possible stage of the state court. It was never granted. He's done the only thing that he can do, which is submitted an affidavit that satisfies the Daubert standard. In his affidavit, the photogrammetrist, Mr. Locke, goes through the science behind photogrammetry. Really, it's not much more complicated than Euclidean geometry, your honors. Mr. Locke goes through it. Mr. Locke explains why it's reliable and why indeed photogrammetry has a history that's quite old and goes back many, many decades, your honors. We've cited cases in the brief in which photogrammetry has been admitted in the federal courts. The photogrammetry, coupled with the DNA analysis in this case, shows that Mr. Thornton wasn't the person who robbed the cash express. First, he was too tall. And second, the zip ties were analyzed for their DNA. And the zip ties that were used to bind the employee of the cash express showed that there was a male's profile on both zip ties. It was the same male across both zip ties. And that male was not Mr. Thornton. The cash express, the employee, by the way, was a woman. So it's notable that that's a male DNA on the zip ties because we know it wasn't the employee. And it's notable that it was the same male on both zip ties because that shows an unlikelihood that this is the result of contamination. Your honors, simply put, Mr. Thornton could not have been the robber of the cash express. All right. Mr. Castor, let's go over it. First of all, wasn't there testimony that the robber was wearing gloves? Therefore, the petitioner's DNA would not be expected to be on the zip ties? Yes to the first part of that question, but no to the second part of that question, respectfully, your honor. Yes, at trial, there was testimony that the robber wore gloves. There was no testimony at trial, just to be clear, as to whether or not the robber's DNA could be expected to be on the zip ties. And indeed, if you're wearing gloves, how would you get DNA from your fingers onto the zip ties? Certainly. And your honor, Dr. Heinig explains that in her affidavit to the state court on post-conviction relief, Dr. Heinig at the time was the head of DNA testing for DDC Diagnostics, a private lab that specializes in DNA testing. And Dr. Heinig explains that it would be quite simple for the perpetrator's DNA to be on the zip ties, even though he was wearing gloves. And that's through a couple of different ways. One is all the robber would have had to have done was once he was wearing gloves, would have been to have touched his sweaty face in order to have his own DNA on the outside of the gloves that would transfer to the zip ties. Secondly, there was no suggestion and no evidence that in either purchasing the zip ties from a store or in preparing to commit robbery, the perpetrator was wearing gloves at all time. Dr. Heinig explains in her affidavit that it is conceivable and in fact likely that the perpetrator's DNA was on the zip ties. And that's the only evidence that was in the record in front of the state court and that's now in the record before this court on habeas relief regarding whether or not one would expect the perpetrator's DNA to be on the zip ties. The only evidence is Dr. Heinig's testimony. The state and evidence in the record is Dr. Heinig's testimony that one would expect despite the presence of gloves to find the perpetrator's DNA on the zip ties. And again, the fact that it's the same DNA profile on both zip ties makes the finding of the DNA highly probative in this case. Okay. Now you acknowledge that your standard for actual innocence is that you must show that it's likely that no reasonable juror would have convicted your client in light of the new evidence? That is correct, your honor. So we look at all the evidence and you do have the photographic expert evidence on your side, but there's a lot of evidence for a guilty verdict here. Is there not? I mean, first of all, you've got the store teller who testified that yes, Thornton was in fact the robber. And then you have the sunglasses and the Cincinnati Reds t-shirt that was found in Mr. Thornton's apartment that the teller identified as being worn by the robber. You also have his spontaneous statement to his mother that when the police came to the house, they think I robbed the cash express. I think it's funny. They spontaneously just talked about a robbery that no one had even brought up. You've got his confession to his friend. You've got his change of alibi. I mean, there's a lot of evidence here. And I guess your argument is that your expert would have caused a reasonable juror to disregard all that? Well, I only have about two minutes, Your Honor. But let me pull apart as many of those pieces of evidence as I can. First of all, it's important to remember how Ms. Fahey, the cash express employee, identified Mr. Thornton and what her testimony was on that. She put her hand across the lower half of the faces in the lineup that she was shown. It's a very suspect method of your honor. But in this case, it's not a very strong identification when the victim or the employee is saying that they only saw the top half of someone's face. Secondly, Your Honor, I'd like to push back gently on the notion that Mr. Crawford, the informant in this case, was Mr. Thornton's friend. That's not consistent with the testimony in the trial court. I know that the Crawford testified that he was an acquaintance of Mr. Thornton from high school, not a friend. And the circumstances of that confession simply strained credulity, Your Honor. That for some reason, upon seeing someone that he hadn't seen since high school, when they run into each other in a probation office, and recall the reason Mr. Thornton was there was because he was on supervised pretrial bond at the time, that he would spontaneously confess to this guy that he and this is not simply a DNA exoneration, this is DNA plus photogrammetry. In every exoneration that relies on new scientific evidence, there is evidence of guilt, because there was always the basis for the underlying confession, or the conviction rather. The question that the court has to ask is, does that evidence hold up in the wake of other testimony? And again, Your Honor, I would point the court to what the trial court itself said. The trial court itself in post 1269 of the record before the court says the photogrammetry would have gone a long way because without the photogrammetry, all that the jurors had was trial counsel's admonitions that Mr. Thornton was too tall to be the guy in the video. That's not the same thing as scientific evidence. And that's what's before the court now. Your Honor, in this case, the science doesn't lie. And it's not difficult analysis. It's just math and angles, Your Honor. Actually, I mean, your expert just may be wrong. I mean, he's not rebutted. I take that. But experts sometimes do get it wrong. And just because an expert has an opinion, doesn't mean it's necessarily true. His opinion is necessarily true. That's all. And a jury doesn't have to accept every expert's opinion, particularly if you have so much evidence of guilt here. Again, Your Honor, I respectfully question the characterization of so much evidence of guilt. And I would remind the court. I just ran through five things. I mean, you talk about the confession, you talk about the eyewitness identification, but you also have the sunglasses and the Cincinnati Red T-shirt that were found in his apartment that the teller identified. You got his spontaneous statement in front of his mother that all of a sudden he brings up a robbery that no one has even talked about. And you've got his change of alibi. I mean, you've got all kinds of things here. Well, and I realize I'm out of time, but to answer Your Honor's question, one thing I'd remind the court of is that the evidence was not strong. There were two trials in this case. Trial number one occurred and resulted in a hung jury. Trial number two occurred after the state dug up Mr. Crawford, who the state acknowledged at page 688 of the record before the court, had his own motives to try to seek curry, to try to seek favor with the state. Only after the state had Mr. Crawford, the informant, was the state able to obtain a conviction in this case. This was not a case with overwhelming evidence of guilt, at least not to the jury who heard it the first time, Your Honors. This is a case with very questionable evidence of guilt. And I'd point out what wasn't found in the apartment, what wasn't found in the car, what wasn't found anywhere that the police searched. The money from the robbery, the gun, the hat that was supposedly worn, any shred of physical evidence besides the t-shirt, allegedly. And there was some different statements made at different times by Ms. Fahy about the nature of that t-shirt that were found. So while there was some evidence of guilt, there's always some evidence of guilt to support a conviction. Okay, very good. You'll have your three minutes rebuttal. Let's hear for the attorney for the board. Thank you, Your Honor. Thank you. I'm sorry, we can't hear you. Can you hear me now? Yes, we can. Okay, that's odd. But anyway, may it please the court, my name is Marianne Reese. I am representing the warden on this case. And we are asking the court to affirm the judgment of the district court. First, I'd like to point out that the petitioner has the burden of rebutting the presumption that the facts as found by the Ohio Court of Appeals are correct. He has not met the burden here. He has not come forth with clear and convincing evidence in the face of which no reasonable fact finder would find him guilty. And I believe Judge Griffin has already done an exhaustive job of pointing out all the ways that that is true. And I'm not going reiterate it. I would note that every judge that has looked at this case has, with the exception of two members of this court, has found in favor of of the state and of upholding the prosecution here. The second or successive petition was two to one with the dissent. The identifications by Ms. Fahy, there was initially one that did not identify petitioner from that. So it was a strong identification. The successive petition is time barred. And petitioner does not dispute the initial time petition wasn't filed until 2014. Even taking a time frame more favorable to petitioner, he maintains that his start date is when he became aware with due diligence of the report on the zip ties and the photogrammatic evidence. And these weren't known to him until March 27th of 2012. He argues that he couldn't have been aware of these claims before then, even with due diligence. But he still waited until July 2014 to file his habeas claim, his federal habeas corpus petition. And he's not entitled equitable tolling. There was no due diligence between his resentencing in 2009 and his contact with the Innocence Project in 2011. Again, that federal habeas case was not filed until 2014. Counsel, if he meets the schlup standard, then those are all by the boards. Is that correct? That's correct. Okay. So for me, we're down to whether he meets the schlup standard. What exactly is a juror thinking? I'm just asking a conceptual question. Here we have, let's say a juror got this evidence. How could a juror in his or her mind disregard it? Just saying, well, I see that this person, I assume this person, what, shrank or what? I mean, what is the rationale for rejecting this evidence in that hypothetical juror's mind? That's my question. I know there's a lot of other evidence, but it's possible that irrefutable evidence would have caused you to believe all that stuff wasn't true. I mean, if we had some irrefutable evidence that the criminal was six feet tall and that the defendant is six foot three or vice versa, if that was incontrovertible, then all that other evidence would have to go by the boards in the reasonable mind, right? You can't grow three inches in a couple of months. That would be true, your honor. However, we're assessing height here and a jury would be free to A, assess the word of one expert. And it's only one expert. So you're saying, pardon me for interrupting. So your answer is that the jury could reasonably just say, this expert may be lying. Or a jury could look and say, well, he looks six feet something to me. Yeah. But I'm asking how the jury will in turn, maybe this is not relevant, but it makes sense to me to ask this question. What is that juror thinking about this evidence? You can tell me what they think about the rest of the evidence. That all makes sense. But what's the juror thinking about this evidence? One, he may be lying. Sure. I guess he may be lying. That makes sense. Is that it? Or you're also suggesting maybe he thinks that, I don't know, what else? What else could it be? I'm not asking you about the other evidence. I'm asking you about this evidence. How is he internalizing this evidence? The photogrammatic evidence, the height issue. Yes, yes, yes. Well, at that time that was not well-developed and was not used often. He just may have miscalculated or applied a theorem within that science, which is not an I see. And in that one instance. And we don't have too much evidence of how accurate these kinds of evidence are, or we do. Are there examples where people have gotten it wrong and shown to be wrong? Certainly, Your Honor. I don't know that they are in the record at this point, but. The juror may have assumed that something like that must have happened in light of the other evidence is basically what you're saying. Or a juror looks at, right, looks at all the evidence. And well, an example in the last two years, we've all been told to stay six feet away from each other. My, you know, my father is six, was six four. So I've been trying to gauge lengths of my father throughout is my way of doing that. A juror might have his or her own way of gauging that. Seems though, I must say, it seems like a type of science that would be pretty precise. I mean, you're doing, you're dealing with angles and distances and sines and cosines and stuff like that. It's not something like, is this germ going to infect me? Which, you know, has all these myriad different kinds of things that might go into it. And you could understand scientists having different perspectives about how far away you need to stand from somebody else to avoid a new disease compared to how far away a Coca-Cola bottle has to be from the camera in order to compare to the height of a clock. That's also somewhat less distance from the camera that you know is six inches high. And therefore you figure out that the Coke bottle is eight inches high or something like that. Seems like something that the scientists aren't going to disagree on once they get together and talk about it, or mathematicians. Do you see what I'm asking? And would it have developed since 2009 or 2007? Really, that kind of science is going to develop very much. I mean, it's just angles. Well, it's photography. It's, you know, right. And it's the ways of measuring. Photography may, by a certain angle, increase angles and stuff like that. The time of day, the lighting. Yeah, sure. As we're finding out through. And finally, with regard to the argument about the gloves and the DNA testing. Again, that didn't prove anything one way or the other. But the photography showed the assailant wearing gloves. So the zip ties, he may or may not have touched them. It could have originated where they were manufactured or where they were gathered and And so we conclude that, you know, there was not an effective assistance of trial counsel here. It did not equitably told the statute of limitations for petitioner. And if the court has any other questions, we're happy to try to answer them. Otherwise, this would conclude our argument. And we guess that the district court affirmed that this court affirmed the judgment of the district court. Any further questions, Judge Rogers, Judge Zavar? All right. Thank you, Ms. Rees. Mr. Castor, you have three minutes rebuttal. Good afternoon, Your Honors. With all due respect, this standard put forth by learned counsel for the respondent weeds out of case law, eliminates any possibility of any SHLOOP claim ever succeeding. And clearly, the Supreme Court meant what it said in SHLOOP, that there is an actual innocence gateway. But counsel's position seems to be that this court can assume that a jury would reject newly presented evidence, even if there's no reasonable reason for the jury to do so. Here, Your Honor, there is no reasonable reason for the jury to have rejected the photogrammetric analysis of Mr. Locke. And indeed, with respect to questions like margin of error, that was baked into Mr. Locke's analysis. If the court goes back and looks at the affidavit with his analysis, Mr. Locke told the court below and tells this court what the margin of error is. And it's in the analysis. And it's accounted for that there's a possibility of some fraction of an inch on either side of his ultimate conclusion. Well, counsel, let me ask you something in response to that, to square this away in my mind. It would seem to me that if you had something which you could prove incontrovertibly was 63 inches tall in the picture, and you had a picture of him standing next to it, where he was taller than that, it would seem to me that would be much more incontrovertible than something where you have to rely on some experts using of trigs and cosines and things like that. So that would preserve the possibility that, sure, there are some things that prove you're innocent, that just can't be controverted by people who believe in science. I'm just not sure that this arises to that, because we have to sort of accept a whole bunch of calculations that we don't know what they are. Or the juror wouldn't know what they are, because they haven't been presented. Agree with me? Well, the juror was not presented with it, and we would argue that's why he was convicted. Well, I understand that. But we're trying to see whether you've shown that no juror, when presented all of this, would come to a different conclusion. And you say if we don't agree with you, we will be precluding that ever happening. But I'm trying to hypothesize that, sure, that could happen, where no juror would reject it, except people who reject science generally. But I'm not sure this is that, because it depends on our confidence in a science that we don't really understand. I think I understand your question and your point, Your Honor. And two responses, hopefully, in 25 seconds. First of all, the standard presumes a reasonable juror, not just any jurors. So the question is, is it reasonable to reject the evidence? And secondly, Your Honor, this standard of permitting any juror, regardless of presumption of reasonableness, to reject any evidence would also permit the juror to reject your proposed hypothesis, where you see a photo. Because in such a case, opposing counsel would come and say, well, but we don't know what the exact angle of the camera is, or this is 2021. It could have been a deepfake picture, or any of all sorts of other things in response to, well, this person could be standing next to an object that isn't six feet tall. But in this case, Your Honor, Mr. Locke's methods are fully explained in his affidavit. And he told the court in post-conviction proceedings that he went back to the scene, and he measured the height of a known object. And that's what enables him to come to the conclusions that he does. Because again, this is simply a math problem. The idea that a reasonable juror would reject any science would enable jurors to reject in DNA-based cases, and any other evidence that comes before the court that questions what is a reasonable, properly instructed juror do. And here, there is no evidence in the record that contradicts Mr. Locke's analysis. There's only supposition that it might be wrong for some reason that we don't know. But the state chose not to present that evidence in the state court, and chose again not to present any evidence in the court below. Your Honors, Mr. Thornton is innocent of the crime that he was convicted of. The court below erred in failing to grant him habeas relief. And we respectfully request that this court reverse that judgment, and remand with instructions to enter a writ of habeas corpus. Thank you, Your Honors. Thank you, Mr. Gasser. Any further questions? Judge Rodgers? Judge Stephan? All right, seeing none, the case is submitted. You may adjourn court.